UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
L.C. and FAIR HOUSING JUSTICE CENTER,   :       13 Civ. 2759 (DLC)
INC.,                                   :
                                        :       OPINION AND ORDER
                    Plaintiffs,         :
          -v-                           :
                                        :
LEFRAK ORGANIZATION, INC. and ESTATES   :
NY REAL ESTATE SERVICES LLC. d/b/a      :
Kings & Queens Leasing and LeFrak city  :
Leasing,                                :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

APPEARANCES

For the Plaintiffs:

Armen Hagop Merjian
Housing Works, Inc.
320 W. 13th St., 4th Floor
New York, NY 10004-1490

Diane Lee Houk
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019


For the Defendants:

Randy M. Mastro, Gabriel Herrmann, and Jennifer H. Rearden
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 48th Floor
New York, NY 10166


DENISE COTE, District Judge:

        The two plaintiffs in this action are L.C., an indigent

woman living with HIV/AIDS, and the Fair Housing Justice Center,

1

Inc. ("FHJC").  They bring claims under the Fair Housing Act ("FHA") and the New York City Human Rights Law ("HRL"), alleging that defendants LeFrak Organization, Inc. and Estates NY Real Estate Services LLC (collectively "LeFrak") have discriminated against L.C. and persons living with symptomatic HIV or AIDS. LeFrak has filed a motion to dismiss.  For the following reasons, the motion is denied.


BACKGROUND

The complaint includes the following allegations.  New York City ("City") created the HIV/AIDS Services Administration ("HASA") in 1985 as a subdivision of the City's Human Resources Administration to address the special needs of the indigent population of the City with clinical or symptomatic HIV or AIDS. HASA provides the owners of City apartments with a "direct-vendor check" for the first month's rent and a voucher for a security deposit equal to one-month's rent after a HASA client has located a privately owned apartment within the City and after HASA has approved the apartment.  HASA also provides direct-vendor checks for a full month's rent in each of the succeeding months that the HASA client occupies the apartment.  HASA does not provide a letter to landlords, however, assuring them that HASA will pay a sum certain in housing subsidies for its clients.

In September 2011, HASA advised L.C. that it would provide

her with a full housing subsidy in the range of approximately $1,100 per month for a suitable apartment, as well as a security deposit, broker's fee, and the first month's rent.  L.C. visited the website for LeFrak City, saw that there were apartments available to rent there for about $1,100 per month, and called the rental office listed on the website.  L.C. was directed to an office on Queens Boulevard that deals with applicants who will be using government benefit programs to pay their rent.  At that office, Lefrak required L.C. to provide a letter from HASA that would confirm that HASA would pay a sum certain for the rent. L.C. explained that HASA does not provide such letters but that HASA had informed her that the agency would pay about $1,100 per month for an apartment.  The Lefrak employee stated that she needed the HASA letter to process L.C.'s application.

L.C. thereafter met with her HASA case manager, who explained that HASA does not provide such confirmation letters. The HASA supervisor agreed that HASA does not do so.  The HASA case manager called Lefrak and explained this policy, confirming what L.C. had told Lefrak.

L.C. visited Housing Works to explain what had happened. When the Housing Works case manager called Lefrak, the Lefrak employee repeated that the HASA letter had to be submitted before Lefrak would process L.C.'s application.  Lefrak admitted that it had apartments available for around $1,100 per month.

3

In May 2012, FHJC sent testers to Lefrak.  At that time, it was listing three apartments for rent at around $1,100 per month at LeFrak City.  One tester explained that she was employed and earned $46,000 a year and wanted to rent a studio or one-bedroom apartment for $1,100 per month at LeFrak City.  In the LeFrak City rental office, she was shown a floor plan and given an application.  She was then taken to and shown a studio apartment. The tester did not have any documentation with her and was told that was not a problem.

During this same month other testers, who explained that they had a brother living with AIDS who had a HASA housing subsidy, were directed by Lefrak to another office for renters using government program subsidies.  These testers were not shown any apartments.  They were told they had to bring all of the necessary paperwork, fill out an application, and wait for Lefrack to do a criminal and credit background check.  They were also told that they would need a letter from HASA confirming how much rent HASA would pay.  Lefrak insisted on such a confirmation letter even after the testers informed the employee that HASA does not want to put that confirmation in writing.  The testers were told that, after the aforementioned process was completed, they would be put on a waiting list for an apartment.  The office in which these conversations occurred had a glass window separating the tester from the Lefrak employee; the window had a

4

slot at the bottom.

On April 25, 2013, L.C. and FHJC filed this action, seeking a declaratory judgment, injunctive relief, and compensatory damages from the defendants.  On June 20, the defendants moved to dismiss, and plaintiffs subsequently filed an amended complaint on July 11, which is the operative complaint for purposes of this Opinion ("Amended Complaint").  On August 20, the defendants moved to dismiss the Amended Complaint.  Plaintiffs filed their opposition on September 17, and defendants their reply on October 1.  The motion was fully submitted as of October 1.

DISCUSSION

This Court has a jurisdictional obligation to address whether each plaintiff has Article III standing to bring this action.  The Article III standing inquiry "focuses on whether the plaintiff is the proper party to bring [the] suit."  Raines v. Byrd, 521 U.S. 811, 818 (1997) (citation omitted).  To establish constitutional standing,

> [t]he plaintiff must have suffered an "injury in fact"
> -- an invasion of a legally protected interest which is
> (a) concrete and particularized, and (b) "actual or
> imminent," not "conjectural" or "hypothetical."
> Second, there must be a causal connection between the
> injury and the conduct complained of -- the injury has
> to be fairly traceable to the challenged action of the
> defendant, and not the result of the independent action
> of some third party not before the court.  Third it
> must be likely, as opposed to merely "speculative" that
> the injury will be redressed by a favorable decision.

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)
(citation omitted).  There can be no dispute that plaintiff L.C.,
an individual who was directly harmed by the Lefrak policies
being challenged in this action, meets the requirements for
constitutional standing.

Plaintiff FHJC, however, is an organization.  The Second
Circuit has explained the two ways in which an organization can
meet the requirements of constitutional standing.

> It may sue on behalf of its members, in which case it
> must show, <u>inter alia</u>, that some particular member of
> the organization would have had standing to bring the
> suit individually.  In addition, an organization can
> "have standing in its own right to seek judicial relief
> from injury to itself and to vindicate whatever rights
> and immunities the association itself may enjoy."

<u>New York Civil Liberties Union v. New York City Transit
Authority</u>, 684 F.3d 286, 294 (2d Cir. 2011) (quoting <u>Warth v.
Seldin</u>, 422 U.S. 490, 511 (1975)) (other citations omitted).  In
<u>Havens Realty Corp. v. Coleman</u>, the Supreme Court held that,
where an organizational plaintiff had alleged it "had to devote
significant resources to identify and counteract the defendant's
[sic] racially discriminatory steering practices," "there can be
no question that the organization has suffered injury in fact,"
and thus the organization had Article III standing to sue.  455
U.S. 363, 379 (1982).

FHJC has alleged that it "expended staff time and other
resources to investigate and respond to Defendants'

discriminatory rental practices, which diverted resources away
from other FHJC activities."  This allegation is sufficient to
plead injury-in-fact and thus organizational standing.
Accordingly, it appears at this juncture that FHJC has Article
III standing to bring this action.  It is therefore appropriate
to turn to the defendants' motion to dismiss the claims pleaded
by both plaintiffs.

        To survive a motion to dismiss, "a complaint must contain
sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face."  Ashcroft v. Iqbal, 556
U.S. 662, 678 (2009) (citation omitted).  Applying this
plausibility standard is "a context-specific task that requires
the reviewing court to draw on its judicial experience and common
sense."  Id. at 679.  When considering a motion to dismiss under
Rule 12(b)(6), a trial court must "accept all allegations in the
complaint as true and draw all inferences in the non-moving
party's favor."  LaFaro v. New York Cardiothoracic Group, PLLC,
570 F.3d 471, 475 (2d Cir. 2009).  A complaint must do more,
however, than offer "naked assertions devoid of further factual
enhancement," and a court is not "bound to accept as true a legal
conclusion couched as a factual allegation."  Iqbal, 556 U.S. at
678.

        The Amended Complaint asserts five claims.  Three are
pleaded pursuant to the FHA and two are pleaded pursuant to the

7

HRL.  In their motion to dismiss, the defendants make principally
three arguments.  First, they argue that the Amended Complaint
fails to plead any disparate treatment claim.  Next, they assert
that the Amended Complaint fails to plead a disparate impact
claim under the FHA because it does not adequately plead a
comparison between the affected and unaffected groups and because
it does not adequately allege causation between any Lefrak policy
and any adverse impact.  Finally, they argue that the Amended
Complaint's pleading of source-of-income discrimination pursuant
to the HRL must be dismissed because, among other things, Lefrak
requires all applicants for housing to submit proof of their
source of income before they are permitted to rent an apartment.

Before proceeding to address each of these arguments, as
well as others made by the parties, two preliminary observations
are in order.  First, in support of their motion to dismiss,
defendants rely on facts not asserted in the Amended Complaint
and have introduced L.C.'s rental application as an exhibit.  The
Court may not consider either.  At the stage of a motion to
dismiss, the Court "is limited to facts stated on the face of the
complaint and in documents appended to the complaint or
incorporated in the complaint by reference, as well as to matters
of which judicial notice may be taken."  <u>Automated Salvage
Transport, Inc. v. Wheelabrator Environmental Systems, Inc.</u>, 155
F.3d 59, 67 (2d Cir. 1998).  The facts that defendants assert are

not subject to judicial notice, and L.C.'s rental application is not "integral" to the Amended Complaint.  Accordingly, the Court considers only the facts asserted within the four corners of the Amended Complaint.

Second, the Court construes the Amended Complaint as presenting discrimination claims on the basis of disability under both disparate treatment and disparate impact theories.  The Amended Complaint includes an allegation that defendants' policies constitute "intentional discrimination based on disability."  Because "intentional discrimination" is another way of saying "disparate treatment," see United States v. Brennan, 650 F.3d 65, 113 n.50 (2d Cir. 2011), plaintiffs have raised both disparate treatment and disparate impact theories.

A. FHA Claims

The plaintiffs bring three FHA claims, under 42 U.S.C. §§ 3604(d), 3604(f)(1), & 3604(f)(2).  Section 3604(d) makes it unlawful "[t]o represent to any person because of . . . handicap . . . that any dwelling is not available  . . . for rental when such dwelling is in fact so available."  Regulations promulgated by the Department of Housing and Urban Development ("HUD") further elaborate the types of conduct prohibited under this section.  Among the identified prohibited conduct is the following:  "Limiting information, by word or conduct, regarding

9

suitably priced dwellings available for inspection, sale or rental, because of . . . handicap."  24 C.F.R. § 100.80(b)(4).

Section 3604(f)(1) makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap."  The Fourth Circuit recently recognized that the words "otherwise make unavailable or deny" includes "the imposition of more burdensome application procedures, of delaying tactics, and of various forms of discouragement by resident managers and rental agents."  Corey v. U.S. Dep't of Housing & Urban Dev., 719 F.3d 322, 326 (4th Cir. 2013) (citation omitted).

Additionally, HUD regulations defining what it means to discriminate against any person "in the sale or rental" of a dwelling because of handicap, as used in § 3604(f)(1), list five non-exhaustive categories of actions that are prohibited.  They include:  "Refusing to . . . rent a dwelling to, or to negotiate for the . . . rental of a dwelling with, any person because of . . . handicap," and "Using different qualification criteria or applications, or . . . rental standards or procedures, such as income standards, application requirements, application fees, credit analysis or sale or rental approval procedures or other requirements, because of . . . handicap."  24 C.F.R. §§ 100.60(b)(2),(4).

HUD regulations defining what it means "to otherwise make

10

unavailable or deny" a dwelling on the basis of handicap, as used in § 3604(f)(1), state that the following conduct is prohibited:

> (2) Employing codes or other devices to segregate or reject applicants, purchasers or renters, refusing to take or to show listings of dwellings in certain areas because of . . . handicap . . . , or refusing to deal with certain brokers or agents because they or one or more of their clients are of a particular . . . handicap . . . .
> (3) Denying or delaying the processing of an application made by a purchaser or renter or refusing to approve such a person for occupancy in a cooperative or condominium dwelling because of . . . handicap . . . .

24 C.F.R. § 100.70(d).

The third FHA section at issue here, Section 3604(f)(2), makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of a handicap."  HUD regulations list five non-exhaustive prohibited actions in connection with this statute. They include using different lease provisions, delaying repairs, or limiting services associated with a dwelling because of handicap, as well as "[f]ailing to process an offer for the . . . rental of a dwelling or to communicate an offer accurately because of . . . handicap."  24 C.F.R. § 100.65(b).

In short, under the three FHA provisions invoked here, it is illegal to discriminate on the basis of disability[1] in connection

---

[1] The FHA uses the term "handicap" instead of the term "disability."  Both terms have the same legal meaning.  See Bragdon v. Abbott, 524 U.S. 624, 631 (1998) (stating that definition of "disability" in the Americans with Disabilities Act "is drawn almost verbatim" from the definition of "handicap" contained in the Fair Housing Amendments Act of 1988).  This

with the rental of a dwelling by: (1) limiting information regarding apartment availability; (2) using different qualification criteria, procedures, or standards for the rental; or (3) failing to process an offer to rent a dwelling.

"Plaintiffs who allege violations under" the FHA "may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation." Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2002).[2]  In this case, plaintiffs invoke both disparate treatment and disparate impact theories.

"FHA disparate treatment claims [] are analyzed using the McDonnell Douglas burden-shifting framework." Boykin v. KeyCorp, 521 F.3d 202, 213 (2d Cir. 2008).  "Accordingly, once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision.  If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the

_____

Opinion will use the term "disability."

[2] In a footnote in its brief, Lefrak reserved the right to seek additional relief in light of the Supreme Court's decision to grant certiorari in Mount Holly v. Mt. Holly Gardens Citizen in Action, Inc., No. 11-1507, 133 S. Ct. 2824 (Mem.), a case in which the defendants argued that the FHA does not permit disparate impact claims.  In a letter of December 10, 2013, defense counsel advised the Court that the Mount Holly case had settled.  On November 15, 2013, the Supreme Court dismissed the writ of certiorari in Mount Holly pursuant to Rule 46.1 of the

defendant's action." Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003) (summarizing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)).  For both disparate treatment and disparate impact cases, "[p]laintiffs may establish a prima facie case of housing discrimination by showing (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." Id.

Additionally, for disparate treatment cases, "[t]o establish a prima facie case of discrimination under the FHA [], the plaintiffs must present evidence that animus against the protected group was a significant factor" in the position taken by the defendant. Reg'l Econ. Cmty. Action Program, Inc., 294 F.3d at 49 (citation omitted).  "Discriminatory intent may be inferred from the totality of the circumstances." Id. (citation omitted).  The "initial burden of production under the McDonnell Douglas analysis is 'minimal.'" Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).

For disparate impact cases, to establish a prima facie case of discrimination under the FHA, "the plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a

---

Supreme Court Rules.

particular type produced by the defendant's facially neutral acts or practices." Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 574-75 (2d Cir. 2003) (emphasis and citation omitted). "Furthermore, the plaintiff must show a causal connection between the facially neutral policy and the alleged discriminatory effect." Id. at 575.

"The prima facie case under McDonnell Douglas, however, is an evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002). At the pleading stage, "a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 512 (quoting Rule 8(a)(2), Fed.R.Civ.P.).

In Boykin, the Second Circuit applied Swierkiewicz to an FHA claim, one of disparate treatment, and deemed a complaint sufficient where the plaintiff alleged that

> (1) she was an African-American woman, who, on August 1, 2001, sought a loan from KeyBank for property in a predominantly African-American neighborhood; (2) she satisfied all of KeyBank's credit requirements and KeyBank conditionally approved the loan that day; (3) later the same day, KeyBank denied the loan, ostensibly on the basis of a policy against loaning to out-of-state applicants of which the loan officer said he had previously been unaware; (4) the true reason for the denial was her race, her sex and the racial makeup of the neighborhood in which the property was located; (5) similarly situated loan applicants who were not in the protected classes received loans and were treated more favorably throughout the loan application process; and (6) KeyBank relied on its policy as a pretext for discrimination, as evidenced in part by the fact that KeyBank did not offer Boykin the counseling and guidance it offers to other, non-minority loan

14

applicants after denying their loans.
521 F.3d at 214-15 (citation omitted).  The Circuit held that the
plaintiff did "not need to allege discriminatory animus for her
disparate treatment claim to be sufficiently pleaded." Id. at
215.  It was sufficient that the plaintiff stated her protected
status, set forth the circumstances under which she was treated
differently, and included an allegation that this differential
treatment was on the basis of her protected status.  See id.

Plaintiffs have adequately pled their disparate treatment
claims under at least two of the three FHA provisions.  42 U.S.C.
§§ 3604(d), 3604(f)(1).  L.C. alleges that she is a member of the
protected class of those who have a disability, her HIV status.
L.C. sets forth the circumstances under which she was treated
differently than applicants for rental properties who do not have
a disability:  that Lefrak would not show her available
apartments unless she brought certain documents and underwent a
criminal and credit background check.  Based on her allegations,
L.C. has identified two ways in which she was treated differently
(1) in the information given to her regarding available
apartments, namely that she was not shown such apartments, 42
U.S.C. § 3604(d); and (2) in the qualification and rental
criteria applied to her, namely a more burdensome and delayed
process, id. § 3604(f)(1).

The defendants argue that these disparate treatment claims

must be dismissed because the Amended Complaint fails to allege causation.  They assert that the Amended Complaint's allegations describe decisions made by Lefrak on the basis of L.C.'s source of income and not because of her disability or health status. Reading the Amended Complaint generously, it alleges that Lefrak understood that HASA clients, alone of all persons requiring government housing subsidies, would be unable to produce a source-of-income letter at the application stage of the rental process.  This is sufficient to give the defendants fair notice of the plaintiffs' theory that Lefrak intentionally discriminated against L.C.[3]

The Amended Complaint also seeks to plead a disparate treatment claim under a third FHA provision, 42 U.S.C. § 3604(f)(2).  Section 3604(f)(2) is addressed to the "terms, conditions or privileges" relating to the sale or rental or a dwelling and the services provided with that sale or rental.  The corresponding HUD regulations suggest that § 3604(f)(2) relates only to the terms under which a property is made available, and does not relate to the application process, other than the

---

[3] The plaintiffs' opposition brief can be read as suggesting that they do not need to prove that Lefrak's conduct was motivated by discriminatory animus towards those with HIV.  This is incorrect. While a plaintiff need not allege animus at the pleading stage, Boykin, 521 F.3d at 215, in order to ultimately prevail on this claim, the plaintiffs will be required to show that "animus" against the protected group was "a significant factor" in Lefrak's decisions.  Reg'l Econ. Cmty. Action Program, Inc., 294 F.3d at 49 (citation omitted).

failure to process an offer that has been made.  Neither the plaintiffs nor defendants have addressed these regulations or attempted to define or describe the phrase "terms, conditions, or privileges."  Defendants have not moved to dismiss the disparate treatment claim under § 3604(f)(2) on the basis that the allegations in the Amended Complaint fail to state a claim of discrimination with respect to the "terms, conditions, or privileges" of Lefrak housing.  Accordingly, at this stage, plaintiffs' claim of disparate treatment claim under § 3604(f)(2) will not be dismissed.

Plaintiffs have also adequately pled their disparate impact claims under at least two provisions of the FHA.  They have alleged that Lefrak has a facially neutral policy regarding applicants who are recipients of housing subsidies, and that those policies cause individuals within a protected group to be provided with limited information and to face a more burdensome rental process.  They have also sufficiently alleged that the portion of the affected population with a disability, HIV, is disproportionate.  FHA §§ 3604(d), 3604(f)(1).  Because the parties have not separately addressed the scope of § 3604(f)(2) for the reasons already explained, plaintiffs' claim of disparate impact under this section will not be dismissed.

Only one point requires further discussion.  Defendants contend that plaintiffs failed to plead a disparity in outcome

for HIV individuals between the group affected by Lefrak's policy
and the group unaffected.  Although defendants cite various
district court cases stating that plaintiffs must plead a
statistical disparity, the underlying precedent cited in
virtually all of these cases, Tsombanidis, 352 F.3d at 572,
involved a summary judgment motion and a trial, not a motion to
dismiss.  Nevertheless, it is reasonable to expect that
plaintiffs pleading disparate impact claims must include at least
one allegation that raises an inference of such disparity -- one
sufficient to put the defendants on notice regarding the basis
for plaintiffs' belief in a disparate effect.

    Plaintiffs have met this requirement here.  The Amended
Complaint states that, as of 2010, New York City had a population
of approximately eight million individuals, the HIV population in
New York City was approximately 67,000 people, 49% of which are
HASA clients, the "vast majority" of which utilize a HASA housing
subsidy.  This adequately puts defendants on notice that
plaintiffs' alleged basis for disparate impact is that the
percentage of the HIV population in New York City on housing
subsidies exceeds the percentage of the non-HIV New York City
population on housing subsidies.

    Defendants' remaining argument, and one on which they frame
their entire motion to dismiss, is that Lefrak's policy is not
the cause of any disparate impact because HASA's refusal to

18

provide sum certain letters is the true cause of the problem.
Defendants contend that the plaintiffs sued the wrong party.

The absence of a potentially culpable party, however, is an
insufficient basis for dismissal, unless the absent party is
necessary under Rule 19, Fed.R.Civ.P.; see also Rule 12(b)(7),
Fed.R.Civ.P.  Lefrak does not assert that HASA is a necessary
party, and thus Lefrak's argument does not entitle it to
dismissal of the action.[4]


B. New York City Human Rights Law claims

Plaintiffs' fourth and fifth claims are brought under the
HRL, the relevant portion of which is as follows:

5. Housing accommodations, land, commercial space and
lending practices.

(a) Housing accommodations.  It shall be an unlawful
discriminatory practice for the owner, lessor, lessee,
sublessee, assignee, or managing agent of, or other
person having the right to sell, rent or lease or
approve the sale, rental or lease of a housing
accommodation, constructed or to be constructed, or an
interest therein, or any agent or employee thereof:

(1) To refuse to sell, rent, lease, approve the sale,
rental or lease or otherwise deny to or withhold from
any person or group of persons such a housing
accommodation or an interest therein because of the
actual or perceived race, creed, color, national

---

[4] Subsequent to the filing of this action, the Court has been
advised that HASA may provide the type of letters Lefrak seeks,
if the HASA client waives confidentiality protections that
otherwise prohibit HASA from providing such letters under state
law.  This proposition, however, is not within the four corners
of the Amended Complaint and is therefore not considered by the
Court at the motion to dismiss stage.

origin, gender, age, disability, sexual orientation,
marital status, partnership status, or alienage or
citizenship status of such person or persons, or
because of any lawful source of income of such person
or persons, or because children are, may be or would be
residing with such person or persons.

N.Y.C. Admin. Code § 8-107(5)(a)(1).  Paragraph 5(a)(1) is
closely related to FHA § 3604(f)(1).  Plaintiffs' fourth and
fifth claims allege discrimination on the basis of disability and
source of income, respectively.

"For many years," claims brought under HRL were construed
"to be coextensive with its federal and state counterparts."
Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102,
108 (2d Cir. 2013).  "In 2005, however, the New York City Council
amended the HRL by passing the Local Civil Rights Restoration Act
of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85.  As
amended, the HRL requires an independent analysis."  Id. at 109.

"[T]he Act established two new rules of construction.
First, it created a one-way ratchet, by which interpretations of
state and federal civil rights statutes can serve only as a floor
below which the City's Human Rights law cannot fall."  Id.
(citation omitted).  "Second, it amended the NYCHRL to require
that its provisions 'be construed liberally for the
accomplishment of the uniquely broad and remedial purposes
thereof, regardless of whether federal or New York State civil
and human rights laws, including those laws with provisions
comparably-worded to provisions of this title[,] have been so

construed.'" Id. (quoting Restoration Act § 7 (codified at
N.Y.C. Admin. Code § 8-130)).  New York courts have held that
this provision requires courts to "construe [HRL] broadly in
favor of discrimination plaintiffs, to the extent that such a
construction is reasonably possible." Albunio v. City of New
York, 922 N.Y.S.2d 244, 246 (2011); see also Williams v. New York
City Housing Authority, 872 N.Y.S.2d 27, 31 (1st Dep't 2009).

Plaintiffs' fourth claim, which alleges intentional
disability discrimination under HRL, relies on the same factual
allegations asserted for the FHA claims based on disability
discrimination under disparate treatment.  Because it has been
determined that these FHA claims are adequately pled, the one-way
ratchet of the amended HRL dictates that the HRL claim based on
disability discrimination is also adequately pled.

The plaintiffs' fifth claim, however, is not based on
disability discrimination but rather discrimination based on
source-of-income.  Source-of-income is a relatively recent
addition to the impermissible grounds in the provision of
housing, added by the New York City Council in 2008.  Plaintiffs
have alleged their basis for believing that Lefrak's housing
policies treat applicants differently on the basis of income.
Specifically, they have alleged that Lefrak has a different
process for those with less income:  it requires a credit and
criminal background check, and letter documentation of income

before it will show an applicant on public assistance an available apartment.  This is sufficient to give the defendants fair notice of the grounds that the plaintiffs have for asserting that Lefrak is "otherwise" withholding rental accommodation based on the applicant's source of income.

Defendants raise three arguments in moving to dismiss the source-of-income HRL claim, none of which are persuasive.  First, defendants contend that the challenged policy of requiring applicants to provide income documentation before renting an apartment is not discrimination because such a policy is both legitimate and applied to all applicants.

This argument misreads the policy to which plaintiffs object.  Plaintiffs are not objecting to the policy requiring applicants to provide income documentation before renting an apartment; rather, they are objecting to the policy requiring applicants to provide letter documentation before seeing apartments, because it served as an impediment that prevented L.C. from "securing" an apartment.  According to plaintiffs' allegations, this policy applies only to those with lower incomes, thus establishing a prima facie case of disparate treatment based on source of income under HRL.

Second, defendants argue that L.C. cannot prove injury from a denial of housing as, even absent the challenged policy, L.C. would not have been able to rent the Lefrak apartments given

22

HASA's failure to provide documentation of their rental
assistance.  Defendants are correct that, in order to plead a
claim of housing discrimination on the any basis (disability or
source-of-income), L.C. must allege that she would have been
entitled to the housing but for the challenged policy.  The
Amended Complaint, however, meets this requirement.  The
plaintiffs allege that "[o]nce an apartment is located by a HASA
client and approved by HASA, within the legally mandated time
frame, the owner of the apartment is provided with written
documentation in the form of a direct-vendor check for the first
month's rent and a voucher for a security deposit equal to one
month's rent."  With this allegation, plaintiffs assert that,
were L.C.'s application for a Lefrak apartment processed, she
would ultimately meet any income documentation requirements in
order to rent the apartment.

     Third, defendants contend that the alleged form in which
housing was denied is not a violation of HRL § 8-107(5)(a).
Asserting that plaintiffs' sole objection to Lefrak's policy
relates to whether low-income individuals will be allowed to
inspect apartments, defendants contend that discrimination in the
inspection of apartments is not illegal under HRL § 8-107(5)(a).
Defendants point to N.Y.C. Admin. Code § 8-107(5)(c), which
pertains to the conduct of real estate brokers and specifically
includes, in its enumeration of illegal conduct,

misrepresentations with regard to the availability of housing accommodation for "inspection."  Citing canons of statutory construction that where a legislature has used specific language in one provision, the absence of that language in another provision can be presumed to be intentional, defendants argue that the absence of the words "inspection" in N.Y.C. Admin. Code § 8-107(5)(a) dictates that no claim for discrimination in inspection can lie under HRL § 8-107(5)(a).

Defendants' argument fails under the liberal construction required by the HRL.  This Court must give HRL § 8-107(5)(a) the broadest interpretation that is reasonable.  Section 8-107(5)(a) includes the words "otherwise deny or withhold," which are also included in the FHA.  In analyzing these words in the FHA, at least one federal appellate court has suggested that "otherwise deny[ing] or withhold[ing]" access to housing includes the imposition of burdensome application procedures, delaying tactics, and the discouragement of applicants on the basis of disability.  Corey, 719 F.3d at 326.  Limiting an apartment's availability for inspection may be both a delaying tactic and a form of discouragement.  Accordingly, it is "reasonable" to include this practice within the broad proscription set forth in HRL § 8-107(5)(a).

One final issue remains to be addressed.  The two claims for relief in the Amended Complaint brought under the HRL recite the

24

statutory language in § 8-107(5)(a)(1) and identify that specific section of the statute.  In opposition to the present motion to dismiss, the plaintiffs make a brief reference to § 8-107(5)(a)(2).  This subsection of the HRL is not cited or quoted in the Amended Complaint and the plaintiffs will have no further opportunity to amend their pleadings to add such a claim. In their original motion to dismiss, the defendants argued that the HRL claims failed under § 8-107(5)(a)(1).  If the plaintiffs had wished to add an additional HRA claim to the pleading under § 8-107(5)(a)(2), they were required to do so when they were given a final opportunity to amend in response to that motion.  Because they did not, plaintiffs may not now rely on § 8-107(5)(a)(2).


CONCLUSION

    Lefrak's August 20, 2013 motion to dismiss is denied.



Dated:    New York, New York
          December 13, 2013


                              _____
                                       DENISE COTE
                              United States District Judge




25